Priority
Send
Clsd
Enter
JS-5/JS-6
JS-2/JS-3

FILED
CLERK, U S DISTRICT COURT

SEP - 5 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                                DEPUTY

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

ENTERED
CLERK, U.S. DISTRICT COURT

SEP 6 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                                DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **TACO BELL CORP.** | Case No.: CV 04-7019 GPS (CWx)] |
| Plaintiff | |
| v. | **ORDER DENYING TACO BELL CORP.'S MOTION FOR SUMMARY JUDGMENT AND GRANTING TBWA WORLDWIDE, INC.'S, MOTION FOR SUMMARY JUDGMENT** |
| **TBWA WORLDWIDE INC., and DOES 1 through 10, Inclusive,** | |
| Defendant(s). | |

The parties have filed cross-motions for summary judgment on Plaintiff Taco Bell Corp.'s July 2003 Complaint, which seeks contractual indemnification from Defendant TBWA Worldwide Inc. (sometimes referred to herein by its d/b/a, "Chiat/Day") on a $42 million judgment against Plaintiff in June 2003 for

251

breach of an implied contract with a third party in the *Wrench v. Taco Bell*, No. 1:98-CV-45 (W.D. Mich.).

On June 21, 2004, Plaintiff moved for summary judgment, claiming that, as a matter of law, the *Wrench* judgment was binding upon Defendant and that, under the express terms of the parties' agency agreement, Defendant was required to indemnify plaintiff for that judgment.

On July 9, 2004, Defendant filed a cross-motion for summary judgment, arguing the express terms of paragraph 7.1 of the parties' agency agreement precludes indemnity for any claim or liability which is the result of Plaintiff's "fault or negligence" and that the *Wrench* jury verdict and Plaintiff's admissions in the current action conclusively establish Plaintiff's "fault or negligence" under the agency agreement.

After filing of those cross-motions before the Hon. David O. Carter but before briefing on the motions was complete, the case was transferred to this Court.  After hearing argument on these cross-motions, the Court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendant's Motion for Summary Judgment for the reasons stated below.


I.      **BACKGROUND**

The Court finds that the following facts are undisputed:

In June 1996, two Taco Bell corporate executives, Ed Alfaro and his boss, Rudy Pollak, approached Tom Rinks and Joe Shields, the owners of a Michigan corporation, Wrench LLC ("Wrench"), at a licensing trade show in New York City.   Wrench was offering its cartoon character, the "Psycho Chihuahua," for licensing at the trade show.  Pollak and Alfaro discussed the Psycho Chihuahua with Rinks and Shields.  Alfaro suggested the Psycho Chihuahua

1    character "was a natural fit for Taco Bell" and that he would like to "explore the

2    possible use of Psycho Chihuahua in Taco Bell's licensing business."  Alfaro left

3    the trade show with a Psycho Chihuahua tee shirt, which he showed to Taco

4    Bell's then CEO, John Martin.

5       Within days after the June 1996 licensing show, Alfaro called Rinks and

6    informed him that he had "discussed the Psycho Chihuahua with an executive

7    of Taco Bell, who had reacted positively to Psycho Chihuahua."  During the

8    Summer and Fall of 1996, Wrench and Alfaro discussed "various ideas

9    regarding a Psycho Chihuahua and how it might be used by Taco Bell" and "the

10   general desirability of coupling a retail licensing effort with an ad campaign."

11   Wrench also sent Alfaro various materials bearing the image of the Psycho

12   Chihuahua.

13      Alfaro showed the Psycho Chihuahua character to other senior managers

14   at Taco Bell and showed some Psycho Chihuahua materials to an employee of

15   Taco Bell's then-current advertising agency, Bozell Worldwide.  In July 1996,

16   Alfaro was involved with a focus group to which Wrench's Psycho Chihuahua

17   character was shown.  Alfaro later reported to Chris Miller of Taco Bell that the

18   "Psycho [Chihuahua] was a hands-down winner" in the July 1996 focus groups.

19   The memorandum was copied to a senior Taco Bell executive, Vada Hill.

20      In November 1996, Alfaro and members of his staff had a dinner meeting

21   with Arlene Scanlan and Neal Seideman of Strategy Licensing, a

22   Connecticut-based agency that had been retained by Wrench as its licensing

23   agent.  They discussed Taco Bell's possible license of Wrench's Psycho

24   Chihuahua character, including use in Taco Bell's television commercials.  The

25   parties also discussed the fact that, since June 1996, Alfaro had been talking

26   with others at Taco Bell who were aware of the Psycho Chihuahua and liked it,

27

28                         3

1    and that Alfaro believed that Psycho Chihuahua would make a strong "mascot"

2    for Taco Bell.

3         At the dinner meeting, Alfaro and Pollak suggested that Scanlan submit a

4    proposal stating financial terms for the use of the Psycho Chihuahua character

5    by Taco Bell.  Thereafter, Scanlan sent a proposal to Alfaro and Pollak.  After

6    receiving Scanlan's proposal, Taco Bell continued its discussions with Wrench.

7    The parties reached an understanding that if Taco Bell wished to use the

8    Psycho Chihuahua character, it would have to reach an agreement with Wrench

9    specifying the terms of such use.

10        By late 1996 or early 1997, Taco Bell was seeking a new advertising

11   agency to replace Bozell.  In the meantime, Alfaro continued to work with

12   Wrench regarding the possible use of the Psycho Chihuahua character by Taco

13   Bell.  In February 1997, Alfaro met with Wrench in Grand Rapids, Michigan, to

14   "brainstorm" ideas as to how Psycho Chihuahua might be developed for

15   inclusion in Taco Bell's marketing effort, and to develop a "blow-away"

16   presentation.  In considering the various concepts discussed at the meeting, the

17   participants "focused on the concept of Psycho Chihuahua craving or being

18   obsessed with Taco Bell food."  They also discussed "the notion of depicting

19   Psycho Chihuahua as a live Chihuahua, as opposed to a cartoon."  At that

20   meeting, the participants also discussed two of Wrench's concepts for Taco Bell

21   called "Go Psycho" and "Psycho-size it."

22        In April 1997, Strategy Licensing representatives traveled to Taco Bell's

23   offices.  Alfaro knew that the Psycho Chihuahua image would have to be

24   adapted to a point where it would be saleable to Taco Bell's executive staff and

25   Taco Bell's customers.  Wrench had agreed to coordinate with Alfaro to change

26   the image of their Psycho Chihuahua.  Alfaro believed that the appearance of

27

28                                          4

1   the Psycho Chihuahua character changed significantly in certain documents

2   created by Wrench after the February 1997 meeting.  Alfaro testified that he

3   believed he was the "driving force" behind certain changes in Wrench's

4   presentation of its Psycho Chihuahua character.  Alfaro stated in January 1999

5   that, by April 1997, the Psycho Chihuahua character that he had developed with

6   Wrench "closely resemble[d]" the Chihuahua which subsequently appeared in

7   Taco Bell's commercials.

8        In early 1997, the Wrench Psycho Chihuahua character was also being

9   presented to Taco Bell by an entirely different source.  At or about that time,

10  TLP, a promotion agency, presented various concepts to Taco Bell for a

11  possible "Cinco de Mayo" promotion.  Wrench's Psycho Chihuahua was one of

12  several concepts TLP proposed to Taco Bell for the Cinco de Mayo promotion.

13  Hill was present at the meeting during which TLP presented the Psycho

14  Chihuahua concept to Taco Bell.  Taco Bell conducted focus group research to

15  study consumer reaction to several promotional concepts, including the Psycho

16  Chihuahua.  The focus groups were authorized by five separate employees of

17  Taco Bell, including Hill and Linda Firey-Oldroyd.  A full report of the qualitative

18  findings of the focus group research were set forth in a February 21, 1997,

19  memorandum to Hill.  Three Taco Bell executives, Firey-Oldroyd, Peter Waller,

20  and Miller, among others, were copied on the report.  The memorandum stated

21  that Psycho Chihuahua was one of only two concepts that "consumers were

22  excited about" and which "consistently sparked positive consumer response."

23  The memo recommended that "any necessary improvements" be made to the

24  Psycho Chihuahua promotional concept.

25       In March 1997, Taco Bell hired TBWA as its advertising agency.  The

26  parties set forth the terms of their relationship in an Interim Letter Agreement

27

28                                    5

1   dated March 18, 1997.  The parties' formal agency-client agreement, which the

2   parties agreed would be construed in accordance with California state law,

3   became effective as of April 1, 1997.

4        On May 20, 1997, and June 2, 1997, TBWA, presented to Taco Bell

5   executives, including Peter Waller and Vada Hill, approximately 30 television

6   commercial ideas for Taco Bell's future advertising campaign.  Among the 30

7   creative ideas was a commercial featuring a boy Chihuahua passing a girl

8   Chihuahua to get to a person eating Taco Bell food, which was presented by

9   TBWA to Taco Bell at the June 2, 1997, meeting.  It is undisputed that Hill,

10   Waller, Firey-Oldroyd and Miller from Taco Bell – all of whom had been copied

11   on prior documents concerning the Psycho Chihuahua – attended all or part of

12   the June 2, 1997, meeting at TBWA.  None of these Taco Bell employees

13   advised TBWA during the June 2, 1997, meeting that another Chihuahua idea

14   had previously been presented to Taco Bell by both Wrench and TLP.  Taco

15   Bell also admits that it never discussed the Psycho Chihuahua character with

16   TBWA prior to June 2, 1997.   Taco Bell approved TBWA's Chihuahua idea for

17   production and broadcast.  Subsequently, Taco Bell launched a national

18   advertising campaign featuring a Chihuahua, and approved additional

19   Chihuahua advertisements for production and broadcast.

20        In June 1997, Alfaro met again with Strategy Licensing representatives in

21   connection with a trade show in New York, and expressed an interest in

22   arranging further presentations of the Psycho Chihuahua character to key

23   decision makers at Taco Bell. After learning in June 1997 "that TBWA had

24   independently developed a commercial featuring a live Chihuahua," Alfaro sent

25   a memorandum to Miller, which was copied to Hill, on June 27, 1997, to let them

26   know that he had been working with Wrench on a Chihuahua idea. Alfaro's

27

28                                 6

memorandum referenced the fact that the Psycho Chihuahua had been a "hands-down winner" in the July 1996 focus groups. The memorandum mentioned "revisiting" the Psycho Chihuahua concept in light of "the parallel path" that TBWA seemed to be taking in "using a real Chihuahua in a Taco Bell spot." Alfaro's memorandum was not disclosed to TBWA.

In July 1997, after a newspaper article was published revealing Taco Bell's intent to air a test commercial featuring a live Chihuahua, Scanlan wrote a memo to Alfaro expressing her concerns about the planned campaign. Specifically, she questioned whether the Taco Bell marketing people "understood the proprietary nature of the information and ideas [Wrench] had developed." Scanlan's memo was not disclosed to TBWA.

In January 1998, Wrench LLC filed a complaint against Taco Bell in the United States District Court for the Western District of Michigan (the "*Wrench* Action") claiming that Taco Bell had used the Psycho Chihuahua character in its television commercials. Taco Bell informed TBWA in January 1998 that Wrench had asserted a claim against Taco Bell for breach of an implied-in-fact contract between Wrench and Taco Bell. Although various causes of action were asserted by Wrench against Taco Bell, all but the breach of implied-in-fact contract claim were dismissed. It is undisputed that TBWA was not a party to the *Wrench* Action, that none of TBWA's then-current employees testified at the *Wrench* trial, that Wrench did not allege that it had had any direct dealings with TBWA, and that TBWA was not a party to the alleged implied-in-fact contract between Wrench and Taco Bell. Ultimately, a jury determined that Taco Bell had breached an implied-in-fact contract to pay Wrench for the use of the Psycho Chihuahua character.

Taco Bell has conceded that TBWA developed the idea of using a

Chihuahua dog in Taco Bell's ads on or before June 2, 1997, and this idea was developed without any influence or input from Taco Bell.  Taco Bell also admits that it never disclosed to TBWA prior to June 2, 1997, any of the ideas concepts or images Taco Bell had received from Wrench.  From the commencement of the *Wrench* litigation through the *Wrench* verdict, Taco Bell maintained that the *Wrench* Action was without merit and that Taco Bell had no contract with Wrench, either express or implied.  While denying any contractual commitment to Wrench, Taco Bell admittedly approved the production and airing of approximately 50 Chihuahua ads between January 1998 and June 2000.

On January 26, 2003, Taco Bell made its first demand for indemnification from TBWA.  On or about July 8, 2003, Taco Bell commenced the present action for indemnification against TBWA.

## II.     LEGAL STANDARDS

### A. SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *McNulty v. Taser Int'l Inc.*, No. SACV 01-395-DOC, 2002 WL 257860, at *1 (C.D. Cal. Feb. 4, 2002) (Carter, J.), *quoting* Fed. R. Civ. P. 56(c).  "[T]he moving party has no burden to negate or disprove matters on which the opponent will have the burden of proof at trial." *Century 21 Region V, Inc. v. Prudential Real Estate Affiliates*, No. SACV97-203 DOC (EEX), 1999 WL 1210818, *2-3 (C.D.Cal. Aug. 4, 1999) (Carter, J.) (internal citations omitted).   "Where the moving party has no burden of proof at trial, the moving party's burden is met by 'showing'--that is, pointing out to the

1   District Court--that there is an absence of evidence to support the nonmoving

2   party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

3           "[T]he existence of some alleged factual dispute between the parties will

4   not defeat an otherwise properly supported motion for summary judgment; to

5   defeat the motion, the non-moving party must affirmatively set forth facts

6   showing there is a genuine issue for trial." *McNulty*, 2002 WL 257860 at *2,

7   *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "When the

8   moving party meets its burden, the 'adverse party may not rest upon the mere

9   allegations or denials of the adverse party's pleading, but the adverse party's

10  response, by affidavits or as otherwise provided in this rule, must set forth

11  specific facts showing that there is a genuine issue for trial.  If the adverse party

12  does not so respond, summary judgment, if appropriate, shall be entered

13  against the adverse party.'" *Id.*, *citing* Fed. R. Civ. P. 56(e).

14

15  **III.   DISCUSSION**

16          The issues of this case require application of the laws of two states:

17  California and Michigan.  On issues relating to the interpretation of the agency

18  agreement, paragraph 12 of the agreement controls: It provides for application

19  of California law.

20          On issues of claim and issue preclusion, the Court looks to Michigan law.

21  Specifically, this Court looks to Michigan law to assess the preclusion effect of

22  the *Wrench* judgment.  "Federal law governs the collateral estoppel effect of a

23  case decided by a federal court." *Trevino v. Gates*, 99 F.3d 911, 923 (9th Cir.

24  1996); *citing Fireman's Fund Ins. Co. v. Int'l Mkt. Place*, 773 F.2d 1068, 1069

25  (9th Cir. 1985).  However, the preclusive effect of a federal *diversity* judgment is

26  determined by the claim-preclusive rule of the state whose substantive law was

27

28                                              9

1    applied by the federal court sitting in diversity. *Semtek Int'l Inc. v. Lockheed*

2    *Martin Corp.*, 531 U.S. 497, 508-09 (2001) (emphasis added). Similarly, the

3    collateral estoppel effect of an earlier federal diversity judgment is determined

4    under the law of the state in which the earlier federal diversity court sat. *See*

5    *Pardo v. Olson & Sons, Inc.* 40 F. 3d 1063, 1066 (9th Cir. 1994). Here, the

6    *Wrench* judgment was entered by a federal court in Michigan applying Michigan

7    law. Under *Semtek*, Michigan law therefore determines the preclusive effect of

8    the *Wrench* judgment. *See also Armstrong v. Rushton*, 294 B.R. 344 (10th Cir.

9    2003)

10       There are two bases for denying Taco Bell's motion for summary

11   judgment on its claim for indemnification and granting TBWA's cross-motion for

12   summary judgment dismissing Taco Bell's complaint in its entirety. First, Taco

13   Bell's "fault" under the terms of the parties' agency agreement precludes

14   recovery from TBWA under the agreement's indemnification provisions.

15   Second, Taco Bell cannot demonstrate that TBWA is bound by the findings of

16   the jury in the underlying *Wrench* action.

17       **A.    TACO BELL'S FAULT**

18           **1.    The Agency Agreement**

19       The current action concerns Taco Bell's claim for indemnification from

20   TBWA for the $42 million judgment against Taco Bell for breach of an

21   undisclosed implied contract with a third party. TBWA's indemnification

22   obligations to Taco Bell, if any, are governed by paragraph 7.1(i) of the parties'

23   agency agreement. The agreement expressly states TBWA is not required to

24   indemnify Taco Bell for any liability based upon or arising out of Taco Bell's

25   "fault or negligence." As discussed below, paragraphs 7.1(ii) and (iii) of the

26   agency agreement have no separate applicability because Taco Bell's claim for

27

28                                          10

indemnification rests entirely on the *Wrench* jury's finding that the Chihuahua character used in Taco Bell's advertising was not "independently created by Chiat Day."

Paragraph 7.1(i) of the agency agreement requires TBWA to indemnify Taco Bell for any liability "based upon or arising out of any materials created, produced and/or furnished by [TBWA] for [Taco Bell] (except for claims covered by paragraph 7.2 below)." Claims covered by paragraph 7.2 are thus specifically excepted from TBWA's indemnification obligation:

> **7.1 Agency Indemnification.** [TBWA] agrees to defend, indemnify and hold [Taco Bell], its officers, directors, employees, and agents harmless from any loss, damage, liability, claim, demand, suit or expense, including reasonable attorneys' fees and costs, that [Taco Bell] may incur or be liable for as a result of ay claim, suit or proceeding made, threatened or brought against [Taco Bell] based upon or arising out of (i) *any materials created, produced and/or furnished by [TBWA] for [Taco Bell] (except for claims covered by Paragraph 7.2 below)*; (ii) Agency's fault or negligence in the performance of its obligations hereunder; or (iii) Agency's breach of its obligations under this agreement.

(Emphasis added). The excepted claims defined by Paragraph 7.2 of the agency agreement include liabilities "based upon or arising out of [Taco Bell's] fault or negligence."

> **7.2 Client Indemnification.** [Taco Bell] agrees to defend, indemnify and hold harmless [TBWA] its affiliated companies and their officers, directors, employees and agents ... harmless from any loss, damage, liability, claim, demand, suit or expense, including reasonable attorneys' fees and costs, that [TBWA] may incur or be liable for as the result of any

11

claim, suit or proceeding made, threatened, or brought against [TBWA]

based upon or arising out of ... (iv) *[Taco Bell's] fault or negligence*.

(Emphasis added).  Therefore, pursuant to the express language of paragraphs

7.1 and 7.2 of the agency agreement, TBWA is not required to indemnify Taco

Bell for any liability that is based upon or arises out of the "fault or negligence of

[Taco Bell]."

As Taco Bell's complaint is one for indemnification of the *Wrench* liability,

Taco Bell's claims under paragraphs 7.1(ii) and (iii) of the agency agreement

flow from and are dependent upon Taco Bell's paragraph 7.1(i) claim and have

no separate applicability in this action.  Paragraph 7.1(ii) requires TBWA to

indemnify Taco Bell in the event of "[TBWA's] fault or negligence in the

performance of its obligations" under the agency agreement.  Paragraph 7.1(iii)

requires TBWA to indemnify Taco Bell in the event of "[TBWA's] breach of its

obligations" under the agency agreement.

Taco Bell's claims under paragraphs 7.1(ii) and (iii), like its claim under

paragraph 7.1(i), are based on the *Wrench* jury's finding that TBWA did not

"independently create" the Chihuahua character used in Taco Bell's advertising.

No other basis for indemnification liability is suggested.  Beyond its collateral

estoppel-based 7.1(i) claim, Taco Bell does not attempt to prove any "fault,"

"negligence," or "breach" on the part of TBWA that would bring its claims for

indemnification within the scope of paragraphs 7.1(ii) and (iii).  In fact, Taco Bell

contends that "TBWA's [indemnification] obligation was without regard to

whether TBWA's fault was the cause of the claim or liability."

Moreover, apart from its attempt to bind TBWA to the *Wrench* jury's

finding that TBWA did not "independently create" the Taco Bell Chihuahua

character, Taco Bell does not offer any separate proof that TBWA did not

12

independently create the Chihuahua character that appeared in Taco Bell's advertising. To the contrary, Taco Bell's pleadings in this action concede that TBWA developed the idea of using a Chihuahua dog in Taco Bell advertising without any input or influence from Taco Bell --- *i.e.* without any of the ideas Taco Bell had previously received from Wrench.

### 2.   Taco Bell's "Fault" Under The Agency Agreement

As discussed above, the indemnification clause of the parties' agency agreement specifically excludes from TBWA's indemnification obligation any liability that is "based upon or arises out of [Taco Bell's] fault and negligence." With regards to this agreement, the facts show that TBWA is not liable to Taco Bell for the following reasons. First, Taco Bell is bound by the *Wrench* finding that it breached an implied contract to pay Wrench for use of ideas, concepts and images Wrench supplied Taco Bell in 1996 and 1997. Second, TBWA was not a party to the implied-in-fact contract between Taco Bell and Wrench and was not aware of Taco Bell's implied contract with Wrench. Third, TBWA had no knowledge of the Psycho Chihuahua character or Taco Bell's dealings with Wrench before proposing a Chihuahua character for Taco Bell ads on June 2, 1997. Finally, Taco Bell approved the Chihuahua character proposed by TBWA, and then continued to approve the Chihuahua advertisements for production and broadcast after commencement of the *Wrench* lawsuit notwithstanding Taco Bell's knowledge of its undisclosed contractual commitment to Wrench.[1]

Although collateral estoppel does not bind TBWA in this instance,

---

[1]   In response to TBWA's motion for summary judgment, Taco Bell's opposition papers denied that Taco Bell had "approved" the airing of the Chihuahua commercials  However, after TBWA's reply memorandum cited the undisputed trial and deposition testimony of former Taco Bell officials that Taco Bell had approved the Chihuahua ads for airing, Taco Bell's counsel, at oral argument, conceded that Taco Bell had approved the ads

1    collateral estoppel does have one application in this case.  Taco Bell, as a party

2    to the *Wrench* action, is estopped from relitigating the findings underlying the

3    *Wrench* jury verdict.  "The doctrine of collateral estoppel precludes relitigation of

4    an issue in a different subsequent action between the same parties or their

5    privies when the earlier proceeding resulted in a valid final judgment and the

6    issue in question was actually and necessarily determined in that prior

7    proceeding."  *Dearborn Heights Sch. Dist. No. 7 v. Wayne County MEA/NEA*,

8    233 Mich. App. 120, 124, 592 N.W.2d 408, 411 (1998).  Moreover, "'[a] party

9    precluded from relitigating an issue with an opposing party ... is also precluded

10   from doing so with another person unless ... he lacked full and fair opportunity

11   to litigate the issue in the first action ....'"  *Monat v. State Farm Ins. Co.*, 469

12   Mich. 679, 692, 677 N.W. 2d 843, 850 (2004) (quotations omitted).  Taco Bell

13   was a party to the *Wrench* action.  It is bound by the *Wrench* jury findings.

14        The jury verdict thus supports the conclusion that the *Wrench* liability was

15   a result of Taco Bell's "fault and negligence."  The only issue litigated at the

16   *Wrench* trial was a claim for breach of an implied-in-fact contract between

17   Wrench and Taco Bell.  The jury determined that  "Wrench and Taco Bell had a

18   mutual understanding that if Taco Bell used the Psycho Chihuahua character in

19   its advertising and on products, Taco Bell would pay Wrench for this use."

20   TBWA was not a party to that implied-in-fact contract.  Moreover, it is

21   undisputed that TBWA did not participate in any of the dealings that resulted in

22   the implied-in-fact contract between the parties.  Those dealings commenced in

23   June 1996 nine months before TBWA was retained as Taco Bell's advertising

24   agency.

25        The *Wrench* jury also determined that "Taco Bell used the Psycho

26   Chihuahua character in its advertising from 1997 to 2000."  Notably, the term

27

28                                          14

1   "Psycho Chihuahua character" was defined in the jury instructions not simply as

2   the Chihuahua character that was owned by Wrench, but more broadly, as the

3   "*the ideas, concepts, and images* based on the identifiable Psycho Chihuahua

4   character created by Wrench and provided to Taco Bell by Wrench."

5   (Emphasis added).  Moreover, the jury was instructed that to find an

6   implied-in-fact contract it had to find that "Wrench disclosed the Psycho

7   Chihuahua character to Taco Bell at Taco Bell's request."  Therefore, when the

8   jury determined that Taco Bell "used the Psycho Chihuahua character in its

9   advertising from 1997 to 2000," the character Taco Bell "used" was the Psycho

10  Chihuahua character that Wrench customized and modified at Taco Bell's

11  request, and then "provided to Taco Bell."

12       It is also undisputed that TBWA was never shown or otherwise exposed

13  to the Psycho Chihuahua character prior to June 2, 1997, when TBWA first

14  presented a Chihuahua advertising idea to Taco Bell.  Taco Bell admitted that it

15  never advised TBWA about the Psycho Chihuahua character at any time before

16  or during the June 2, 1997, session when TBWA presented its first Chihuahua

17  commercial concept to Taco Bell.  Moreover, in paragraph 14 of the Complaint,

18  Taco Bell has conceded that it "did not influence or have input into [TBWA's]

19  idea of using a Chihuahua dog for Taco Bell advertising."  Additionally, after

20  Wrench filed suit in January 1998, Taco Bell denied any contractual obligation

21  to Wrench, while continuing to approve the airing of some 45 additional

22  Chihuahua commercials between January 1998 and June 2000.  As a matter of

23  law, then, the resulting liability for breach of an undisclosed implied contract was

24  Taco Bell's "fault or negligence."  No other inference can be drawn from the

25  undisputed facts.

26       The *Wrench* jury also determined that "the Chihuahua character used by

27

28                                    15

1  Taco Bell was not independently created by Chiat Day."  The jury instruction,

2  however, intertwined Taco Bell and Chiat/Day and required the jury to consider

3  whether "*Taco Bell and Chiat/Day* created the Taco Bell Chihuahua on an

4  independent creative, but parallel path." (Emphasis added).  The jury was also

5  instructed to consider "the access or lack thereof to the Psycho Chihuahua

6  character by people at *Taco Bell and Chiat/Day*." (Emphasis added).  The

7  undisputed testimony establishes that Wrench modified the Psycho Chihuahua

8  at Taco Bell's request to almost resemble a "normal Chihuahua," and that Taco

9  Bell never told TBWA about a contractual commitment to Wrench with regard to

10 the Psycho Chihuahua character.

11     Finally, paragraph 4.1 of the parties' agency agreement provides that:

12 "[TBWA] will obtain [Taco Bell's] prior approval for all work [TBWA] does on

13 [Taco Bell's] behalf."  The agreement further provides at paragraph 6.4 that

14 "[TBWA] will be entitled to rely and act upon any instruction, approval, or

15 authorization given by [Taco Bell] or by any of [Taco Bell's] representatives."  It

16 is undisputed that Taco Bell initially approved the production and broadcast of

17 television commercials featuring the Chihuahua concept that was first presented

18 by TBWA on June 2, 1997-notwithstanding the fact that Taco Bell was the only

19 party that had knowledge of the contractual commitment to Wrench.  And

20 though Taco Bell reserved the right in the agency agreement to "modify, reject,

21 cancel or discontinue any and all work in process" (Paragraph 6.3), Taco Bell

22 continued to approve the production and broadcast of additional commercials

23 featuring a Chihuahua character, after the *Wrench* lawsuit was commenced,

24 while denying that it had any contractual obligations to Wrench.

25     Based on the *Wrench* jury findings, and Taco Bell's admissions in this

26 case, Taco Bell's "fault or negligence" under paragraph 7.2 is established as a

27

28                                  16

1    matter of law, and TBWA, therefore, has no obligation to indemnify Taco Bell

2    pursuant to the agreement.[2]

3

4        **B.    OFFENSIVE COLLATERAL ESTOPPEL**

5            Taco Bell's inability to establish that TBWA is bound by the jury verdict in

6    *Wrench* presents another separate and independent basis for granting TBWA's

7    motion for summary judgment.  Taco Bell rests its case for indemnification on

8    the *Wrench* jury's finding that "the character used by Taco Bell was not

9    independently created by Chiat Day." Taco Bell incorrectly argues that this

10   finding establishes TBWA's indemnification obligations to Taco Bell under the

11   parties' agency agreement.  No other causally-connected basis for

12   indemnification is asserted.

13           TBWA is not bound by the jury verdict in *Wrench*.  First, Taco Bell cannot

14   establish an "identity of issues" between the implied-in-fact contract claim in

15   *Wrench* and the fault-based indemnification claim in the current action.  Second,

16   Taco Bell failed to show TBWA and Taco Bell were in privity with respect to the

17   *Wrench* action. Thus, application of the estoppel bar would violate TBWA's due

18   process rights. It would be "inequitable" therefore to bind TBWA to the *Wrench*

19   jury findings under these circumstances.

20       **1.    "Identity Of Issues"**

21           Under Michigan law, it is well established that, "[i]n order for collateral

22   estoppel to apply, the issue [being litigated] must be identical to that determined

23   in the prior action." *Amalgamated Transit Union, Local 1564 v. Se. Mich.*

24   *Transp. Auth.*, 437 Mich. 441, 451, 473 N.W.2d 249, 253-54 (1991).  "The

25   _____

26           [2] The Court will not address Taco Bell' argument that TBWA is liable for
     proportional indemnification because the Court finds that TBWA is not liable for
27   indemnification at all under these given facts.

28                                        17

1   issues must be identical, and not merely similar and the ultimate issues must

2   have been both actually and necessarily litigated." *Eaton County Road*

3   *Commr's v. Schultz,* 205 Mich. App. 371, 376, 521 N.W.2d 847, 850 (1994)

4   (internal citations omitted). *See also Little v. United States*, 794 F.2d 484, 487

5   (9th Cir. 1986) ("'[s]imilarity between issues is not sufficient; collateral estoppel

6   is applied only when the issues are *identical*.") (emphasis in original) (quoting

7   *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 408 (9th Cir.

8   1985)).

9       Here, Taco Bell has not established that the issue for which it seeks a

10  collateral estoppel bar in the current action is "identical" to the issue decided in

11  *Wrench*, or that it was "actually and necessarily litigated" in that action.  The

12  ultimate issue in the current litigation is whether TBWA is required to indemnify

13  Taco Bell for the *Wrench* judgment pursuant to the terms of the parties' agency

14  agreement.  Because the indemnification provisions of the agency agreement

15  are "fault" based, TBWA's indemnification obligation to Taco Bell does not arise

16  simply by virtue of a judgment against Taco Bell.  Paragraph 7.1(i) of the

17  agency agreement – which governs TBWA's indemnification obligations for "any

18  materials created, produced and/or furnished by [TBWA] for [Taco Bell]" –

19  specifically excepts from TBWA's indemnification obligation any claim that is

20  based upon or arises out of "[Taco Bell's] fault or negligence."  Because

21  liabilities arising from Taco Bell's "fault or negligence" are excluded from

22  TBWA's indemnification obligation, a determination of that "fault or negligence"

23  is a necessary antecedent to indemnification under the agency agreement.  *See*

24  *Heppler v. J.M. Peters Co.*, 73 Cal.App.4th 1265, 1277, 87 Cal.Rptr.2d 497, 509

25  (1999) (rejecting plaintiff's argument that indemnity obligation had been

26  triggered because "indemnitor fault was a prerequisite for indemnity");

27

28                                          18

1 *Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 13 Cal.3d 622, 633, 119 Cal.Rptr. 449,

2 456 (1975) (holding that "the question whether an indemnity agreement covers

3 a given case turns primarily on contractual interpretation ... [and] [w]hen the

4 parties knowingly bargain for the protection at issue, the protection should be

5 afforded.")[3]

6 In contrast, the sole issue litigated at the *Wrench* trial was a claim for

7 breach of an implied-in-fact contract between Taco Bell and Wrench concerning

8 Taco Bell's "use" of Wrench's Psycho Chihuahua character. As part of its

9 verdict, the *Wrench* jury determined "that Taco Bell used [Wrench's] Psycho

10 Chihuahua character in its advertising from 1997-2000 and that the character

11 used by Taco Bell was not independently created by Chiat Day." Taco Bell

12 argues that this limited portion of the *Wrench* jury verdict conclusively

13 establishes TBWA's "fault" for the purposes of determining TBWA's

14 indemnification obligations to Taco Bell.

15 The Court concludes Taco Bell's argument fails because it is undisputed

16 that the *Wrench* jury was never instructed to decide the issue of "fault or

17 negligence" under the indemnification provisions of the agency agreement.

18 With respect to the issue of "independent creation," the jury was instructed as

19 follows:

20 [C]onsider whether, on the one hand, Taco Bell used Wrench's creation of

21

22     [3] Taco Bell relies upon cases such as *United States v. Neumann*
23 *Caribbean Int'l*, 750 F.2d 1422, 1426 (9th Cir. 1985); *Barron v. United States,*
654 F.2d 644, 649-50 (9th Cir. 1981); and *Eller v. Metro Indus. Contracting,*
24 *Inc.*, 261 Mich. App. 569, 575, 683 N.W. 2d 242,246-47 (2004) to argue TBWA,
as "indemnitor," is bound by the *Wrench* jury verdict. The reliance is misplaced
25 and ignores the plain language of paragraphs 7.1. and 7.2 of the agency
26 agreement, which make Taco Bell, and not TBWA, the "indemnitor" for any
claims which arise from Taco Bell's "fault or negligence." Therefore, *Neumann,*
27 *Barron & Eller* are inapplicable

28

1    the Psycho Chihuahua character or, on the other hand, whether *Taco Bell*

2    *and Chiat/Day* created the Taco Bell Chihuahua on an independent

3    creative, but parallel path.

4    (Emphasis added).  The jury was also instructed to consider "the access or lack

5    thereof to the Psycho Chihuahua by people at *Taco Bell and Chiat/Day.*"

6    (Emphasis added).  The jury was thus instructed to determine whether "Taco

7    Bell and Chiat/Day," together, independently created the Taco Bell Chihuahua.

8    It is undisputed that the court never instructed the jury to parse out "fault or

9    negligence" as between Taco Bell and TBWA.  Accordingly, the issue of "fault

10   or negligence" under the indemnification clause of the agency agreement was

11   not "actually litigated" in *Wrench*.

12    Because resolution of the issues in this action requires inquiry into

13   matters that were not litigated in *Wrench*, Taco Bell cannot establish an identity

14   of issues between the two actions, and TBWA is not bound by the findings in

15   *Wrench.  See Amalgamated Transit Union*, 437 Mich. at 451-54, 473 N.W.2d at

16   253-54 (holding that prior finding concerning contract issue did not have

17   preclusive effect in subsequent action concerning related statutory issue,

18   because subsequent action required additional inquiries beyond those

19   presented in prior contract action); *Horn v. Mich. Dep't of Corr.*, 216 Mich.App.

20   58, 62-63, 548 N.W.2d 660, 662 (1996), appeal denied, 456 Mich. 881, 570

21   N.W.2d 656 (1997) (holding that collateral estoppel did not apply because

22   inquiry into whether plaintiff had been sexually harassed in context of prior

23   work-related disability dispute was "hardly identical" to issue of whether

24   employee could establish elements of sexual harassment, retaliation, and

25   constructive discharge in subsequent action).

26    Moreover, under Michigan law, "[c]ollateral estoppel applies only when

27

28

1    the basis of the prior judgment can be clearly, definitely, and unequivocally

2    ascertained." *Ditmore v. Michalik*, 244 Mich.App. 569, 578, 625 N.W. 2d 462,

3    467 (2001), appeal denied, 465 Mich. 896, 636 N.W.2d 141 (2001).  The Ninth

4    Circuit has adopted a similar view: "[c]ollateral estoppel is inappropriate if there

5    is any doubt as to whether an issue was actually litigated in a prior proceeding."

6    *Eureka Fed. Sav. and Loan Ass'n v. Am. Casualty Co. of Reading, Pa.*, 873

7    F.2d 229, 233 (9th Cir. 1989).  "If the decision could have been rationally

8    grounded upon an issue other than that which the defendant seeks to foreclose

9    from consideration, collateral estoppel does not preclude relitigation of the

10   asserted issue." *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1518-19 (9th

11   Cir. 1985).  "'Necessary inferences from the judgment, pleadings and evidence

12   will be given preclusive effect.'"  *Little*, 794 F.2d at 487, *quoting Davis & Cox*,

13   751 F.2d at 1518.  "But if there is doubt, collateral estoppel will not be applied."

14   *Id*.

15          As discussed above, Taco Bell seeks to bind TBWA to the portion of the

16   *Wrench* jury's finding that states "that the character used by Taco Bell was not

17   independently created by Chiat Day."  However, in the corresponding jury

18   instruction, the jury was instructed to consider whether "whether Taco Bell and

19   Chiat/Day created the Taco Bell Chihuahua on an independent creative, but

20   parallel path."  The court also asked the jury to consider "the access or lack

21   thereof to the Psycho Chihuahua character by people at *Taco Bell and*

22   *Chiat/Day*."  (Emphasis added).  As noted *supra*, the *Wrench* jury was never

23   instructed to determine which party, Taco Bell or TBWA, was at fault for the

24   liability in *Wrench*.  At the very minimum, the jury instruction raises a doubt or

25   confusion as to the basis and breadth of the jury's finding that "the character

26   used by Taco Bell was not independently created by Chiat Day."  Where doubt

27

28                                                    21

1    exists as to the basis for the jury's finding, collateral estoppel does not apply.

2        **2.    "Privity"**

3        Michigan law also requires that, for collateral estoppel to apply, the same

4    parties, or their privies, must have had a full and fair opportunity to litigate the

5    issue to be precluded. *Monat*, 469 Mich. at 682-83, 677 N.W. 2d at 845-46.

6    Michigan's Supreme Court held that "[t]o be in privity is to be so identified in

7    interest with another party that the first litigant represents the same legal right

8    that the later litigant is trying to assert." *Adair v. Mich. State*, 470 Mich. 105,

9    122, 680 N.W.2d 386, 396 (2004), *remanded on other grounds*.[4]   Michigan

10   courts have held that application of collateral estoppel is appropriate where

11   there is "substantial identity" between the parties. *Dearborn Heights Sch. Dist.*

12   *No. 7*, 233 Mich. App. at 126, 592 N.W.2d at 412.  "The purpose of the

13   substantial-identity rule is to ensure that collateral estoppel is applied only

14   where the interests of the litigating party are adequately represented in the first

15   proceeding." *Id.*[5]

16   _____

17        [4]    Privity has also been defined by the Michigan Supreme Court as
18   "'mutual or successive relationships to the same right of property, or such an
     identification of interest of one person with another as to represent the same
19   legal right.'" *Sloan v. Madison Heights*, 425 Mich. 288, 295, 389 N.W.2d 418,
     422 (1986) (quoting *Peterson v. Fee Int'l, Ltd.*, 435 F. Supp. 938, 942 (W.D.
20   Okla. 1975)).  A privy includes "one who, after rendition of the judgment, has
     acquired an interest in the subject matter affected by the judgment through or
21   under one of the parties, as by inheritance, succession, or purchase." *Howell v.*
     *Vito's Trucking and Excavating Co.*, 386 Mich. 37, 43, 191 N.W.2d 313, 316
22   (1971).  For all the reasons set forth herein, Taco Bell has not established
23   privity between Taco Bell and TBWA under Michigan's standards.

24        [5]    *See also State Farm Fire & Cas. Co. v. Byrd*, 729 F. Supp. 1265,
25   1267 (N.D. Cal. 1990), aff'd, 933 F.2d 772 (9th Cir. 1991), *quoting Clemmer v.*
     *Hartford Ins. Co.*, 22 Cal.3d 865, 875 (1978) ("In the context of collateral
26   estoppel, due process requires that the party to be estopped must have had an
     identity or community of interest with, and adequate representation by, the
27                                                               (continued...)

28                                    22

For collateral estoppel purposes, Taco Bell and TBWA are not in privity with one another with respect to the *Wrench* action because their interests in that action were in direct conflict under the terms of the agency agreement. *See Richards v. Jefferson County*, 517 U.S. 793, 801-02 (1996) (where interests of class members who were party to a prior litigation are in conflict with absent members who were defendants in subsequent action, privity and due process requirements are not met).  Because the agency agreement exempts TBWA from any duty of indemnification resulting from the "fault or negligence" of Taco Bell, had both entities been parties in *Wrench*, Taco Bell and TBWA's interest would have been diametrically opposed. Taco Bell would have had an interest in structuring a defense which preserved its right to indemnification under the agency agreement. TBWA, on the other hand, would have structured a defense establishing Taco Bell's fault with respect to the *Wrench* liability, thereby defeating the contractual duty of indemnification.  Taco Bell could not have adequately represented TBWA's interests in the *Wrench* action under these circumstances.

The conflict created by the fault exclusion of the indemnification agreement prevents application of the estoppel bar against TBWA.  *See State Farm Fire & Cas. Co. v. L. Arthur Byrd et al*, 729 F. Supp. 1265 (N.D. Cal. 1990), aff'd, *State Farm Fire & Cas. Co. v. Engstrom*, 933 F.2d 772 (9th Cir. 1991).  In *State Farm*, the insured killed a woman, and the woman's estate brought a wrongful death action against the insured.  *Id.* at 1266.[6]  In the stipulated settlement, the parties agreed that, in exchange for not executing

---

[5] (...continued)
losing party in the first action.").

[6] The court in State Farm applied California law

23

1   judgment against the insured's personal assets, the insured would assign his

2   rights under his insurance policy.   *Id.*   Because a showing of willfulness or

3   intent on the part of the insured would render the insurance policy inapplicable,

4   the parties stipulated in the settlement that the insured caused the woman's

5   death without premeditation or intent to kill.   *Id.* at 1267.   Thus, the stipulated

6   settlement was solely in furtherance of the insured's interests and contrary to

7   the insurer's interests.

8        In affirming the lower court's decision, the Ninth Circuit explained that

9   district court held that the stipulated judgment had no collateral effect on the

10   insurer because "[the insurer] was not a party or privy in the former action

11   because of the manifest conflict between [the insurer] and [the insured] on the

12   issue of [the insured's] intent.'" *State Farm Fire & Cas. Co. v. Engstrom*, 933

13   F.2d at 773.   *See also Havens v. Roberts*, 139 Mich. App. 64, 66, 360 N.W.2d

14   183, 183-34 (1984) (after defendant committed a robbery and injured plaintiffs,

15   plaintiffs sued defendant for negligence and obtained a judgment against

16   defendant.  Plaintiffs then filed a garnishment action against defendant's insurer

17   seeking to bind the insurer by prior judgment.  The Michigan state court,

18   however, found that res judicata was improper because insurer had an

19   intentional act exclusion in the contract that put the insurer in direct conflict with

20   the insured.).

21        In light of the above reasoning, the *Wrench* judgment has no collateral

22   effect on TBWA because of the "manifest conflict" between Taco Bell and

23   TBWA.  Just as the insured in *State Farm* had an interest in structuring a

24   stipulated judgment that advanced his interests at the expense of the insurer's,

25   Taco Bell had an interest in structuring a judgment that advanced its own

26   interests at the expense of TBWA's.  The "manifest conflict" is demonstrated by

27

28                                          24

1    Taco Bell's contention here that the jury verdict is dispositive on the issue of

2    TBWA's fault under the indemnification agreement.  It would be a violation of

3    due process to bind TBWA to the *Wrench* jury verdict under these

4    circumstances.

5                    **3.    Equity**

6             "It must be remembered that '[c]ollateral estoppel is an equitable concept

7    based on fundamental principles of fairness.'  Moreover, the offensive use of

8    collateral estoppel is more closely scrutinized than the defensive use of the

9    doctrine."  *White Motor Corp. v. Teresinski*, 214 Cal. App. 3d 754, 763, 263 Cal.

10   Rptr. 26, 31 (1989) (internal citations omitted).  Here, Taco Bell seeks to invoke

11   an equitable doctrine to bind TBWA to a $42 million liability Taco Bell incurred

12   for breaching an undisclosed implied-in-fact contract between Taco Bell and a

13   third party.  It is undisputed that TBWA was not a party to that contract; that

14   TBWA was not told of that contract prior to the filing of the *Wrench* action; and

15   that TBWA was not a party to the *Wrench* action.  It is also undisputed that

16   Taco Bell approved the airing of the Chihuahua ads between January 1998 and

17   June 2000 while denying any contractual obligation to Wrench.  The court's

18   decision not to apply collateral estoppel is also based on these equitable .

19

20       **C.    ADDITIONAL EVIDENCE**

21             In a last minute revamping of its liability theory, Taco Bell attempts to

22   avoid summary judgment by arguing that there is "additional evidence," beyond

23   the *Wrench* jury verdict, to support its indemnification claim.  Citing the

24   introductory language of paragraph 7 of the agency agreement by which TBWA

25   agreed to "exercise its best judgment in the preparation and placing of [Taco

26   Bell's] advertising and publicity with a view to avoiding any claims, proceedings,

27

28                                   25

1    or suits being made or instituted against" it, Taco Bell's opposing brief on

2    TBWA's summary judgment motion reasons that TBWA must have violated that

3    provision because "it is undisputed that Taco Bell did not influence or have any

4    input into TBWA's commercial ideas."  (Citing paragraph 65 of TBWA's Rule 56

5    Statement of Undisputed Facts ). Taco Bell's "additional evidence" arguments

6    are without merit.

7           **1.**    **The "Box Of Materials"**

8        In its Opposition to TBWA's motion, Taco Bell first suggests its

9    indemnification complaint should survive summary judgment because "it is

10    undisputed that sometime between June 27, 1997, and July 26, 1997, Taco Bell

11    sent TBWA a box of Wrench Psycho Chihuahua materials."  Arguing that

12    TBWA's receipt of those Psycho Chihuahua materials violated a TBWA internal

13    policy with regard to "unsolicited ideas and materials," Taco Bell suggests that

14    these facts constitute "circumstantial evidence in support of the jury's verdict

15    that TBWA had not independently created the advertisements," and thus

16    somehow support the instant complaint.

17        Taco Bell's belated argument lacks merit and misconstrues the *Wrench*

18    jury findings. The *Wrench* jury did not conclude "TBWA had not independently

19    created the Advertisements."  Rather, the jury verdict found "that the character

20    used by Taco Bell was not independently created by Chiat/Day."  The verdict

21    form did not address the independent creation of "the Advertisements."

22        Taco Bell's assertion of the "box of materials" argument is unavailing.

23    The undisputed testimony of Taco Bell's current and former employees is that

24    the "box of materials" – which contained no storyboards or commercial ideas –

25    were delivered to Taco Bell *after* TBWA had already begun production of its first

26    Chihuahua commercial.  Accordingly, those materials have no evidentiary value

27

28                   26

1   on the question litigated by Taco Bell in *Wrench, i.e.*, whether "Taco Bell and

2   TBWA" independently created the Taco Bell Chihuahua character it introduced

3   on June 2, 1997.  As Alfaro testified, those materials – delivered in late June

4   1997 – could not have been the basis for TBWA's pre-existing Chihuahua

5   concept.

### 2.    Trademark And Copy Clearance

7           Taco Bell's final arguments that TBWA failed to conduct trademark and

8   copy clearance also lack merit.  The underlying *Wrench* liability involves no

9   trademark and copyright violations.  Rather, as Taco Bell's briefs on appeal in

10  the *Wrench* action conceded, the $42 million breach of implied contract

11  judgment was for Taco Bell's use of an unprotected "non-novel idea."  No

12  trademark search or copy clearance review would have revealed Taco Bell's

13  undisclosed implied contract with Wrench.

14

## IV.  PREVAILING PARTY AWARD

16          Paragraph 15 of the agency agreement provides that the prevailing party

17  in any action on the agreement will be entitled to recover from the losing party

18  such amount as the Court finds reasonable for the legal fees rendered to the

19  prevailing party.  Accordingly, the Court hereby finds TBWA to be the prevailing

20  party under paragraph 15 of the agency agreement and awards TBWA, as part

21  of the judgment herein, its reasonable attorney fees, in an amount to be

22  determined.

23

## V.   DISPOSITION

25          After considering the parties' papers and arguments, the case file and

26  record, and all other matters presented to the Court, IT IS HEREBY **ORDERED**

27

28                                              27

1    that the motion of TBWA is **GRANTED** and the motion of Taco Bell is **DENIED**.

2    TBWA is awarded its fees and reasonable attorney's fees.

3

4

5    **IT IS SO ORDERED.**

6

7    DATED: *September 5, 2007*

8

9                                        GEORGE P. SCHIAVELLI
                                         UNITED STATES DISTRICT JUDGE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                  28